# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

VOLKER STROBEL, HEIKE
STROBEL, and HANS BAUR,
in their individual capacities and on
behalf of UNC Holdings LLC,

       Plaintiffs,

v.                                                                                            No. CIV 18-0656 RB/KBM

UWE RUSCH and DR. MABEL
RUSCH,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on the Motion to Dismiss of Defendants Uwe Rusch and

Mabel Rusch Pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(3), filed on August 13,

2018. (Doc. 7.) Having considered the motion, briefs, attached documents, and relevant law, the

Court finds that the motion should be denied.

In 2012, Defendant Uwe Rusch (Mr. Rusch) was the sole owner and member of a Florida

limited liability company called UNC-FL. In furtherance of this business, Mr. Rusch's wife,

Defendant Dr. Mabel Rusch (Dr. Rusch), registered a trademark in her name. In 2013, Plaintiffs

entered into an agreement with Defendants to become part owners of UNC-FL, and Plaintiff

Volker Strobel (Mr. Strobel) took an active role in advancing the Florida business. Soon thereafter,

the parties became concerned about Florida's regulatory framework and decided to dissolve UNC-

FL and re-establish the business in New Mexico under the name UNC-NM. Mr. Strobel and Mr.

Rusch were managers of UNC-NM. In 2015, Mr. Strobel announced to the parties that the business

was struggling and in need of capital. Thereafter, Defendants took actions that violated the parties'

agreement. Plaintiffs now bring suit for a variety of tort and contract claims. Defendants argue that neither jurisdiction nor venue is proper in New Mexico.

## I.    Factual Background[1]

Defendants are residents of Florida. (Doc. 1 (Compl.) at 1 & ¶¶ 5–6.) In 2012 Mr. Rusch formed UNC-FL, a limited liability company created to produce and sell cordials (a type of after-dinner drink). (*Id.* ¶ 11.) Years before, Defendants had organized a business in Germany and registered the trademark CORDIALS V.I.P. DRINKS (the "V.I.P. Mark" or the "trademark"). (*Id.* ¶¶ 12–13.) After forming UNC-FL, Defendants transferred registration of the trademark from the German company to Dr. Rusch in her own name. (*Id.* ¶ 13.)

Mr. Strobel and Plaintiff Heike Strobel (Mrs. Strobel) are residents of New Mexico. (*Id.* at 1 & ¶¶ 1–2.) The Strobels met Defendants while vacationing in Florida in 2012. (*Id.* ¶ 14.) Defendants told the Strobels "about the business of UNC-FL and invited them to invest in UNC-FL's business . . . ." (*Id.*; *see also* Doc. 18-1 ¶ 6.) At that time, "Mr. Rusch was the sole record owner and member of UNC-FL . . . ." (Compl. ¶ 11; *see also* Doc. 18-6 at 1.) After the Strobels returned to New Mexico, Mr. Rusch began to email and call Mr. Strobel to encourage him to invest in the business. (Doc. 18-1 ¶ 7.) Mr. Rusch visited New Mexico in "April 2012 to discuss several business opportunities, one of which involved the cordials business . . . ." (*Id.* ¶ 8.) In June 2012, both Mr. and Dr. Rusch visited New Mexico to speak with Mr. and Mrs. Strobel about investing in the cordials business. (*Id.* ¶¶ 10–11.) During this visit, Dr. Rusch stated that she would transfer registration of the V.I.P. Mark from her name to UNC-FL. (*Id.* ¶ 11.) Dr. Rusch's consent to transfer registration of the trademark is memorialized in the parties' Partnership Agreement. (*See*

---

[1] The Court recites the facts relevant to this motion as they are derived from the Complaint, affidavits, and other written materials submitted by the parties. The Court resolves all factual disputes in favor of Plaintiffs.

Doc. 18-6 at 2 ("Mrs. Mabel Rusch hereby undertakes to convey to the Holding all rights to the CORDIALS trademark and all rights to the design and logos of CORDIALS products . . . . The transfer of ownership of these rights will be initiated after the signing of this agreement." The transfer is "part of the package of CORDIALS rights that Mr. and Mrs. Rusch are contributing to the Holding.").) She also told Plaintiffs that Mr. Rusch "had authority to speak for her with respect to her ownership of the trademark and participation in the business." (Doc. 18-1 ¶ 11.)

Mr. Rusch, Mr. Strobel, and Plaintiff Hans Baur (Mr. Baur) met in Arizona in early 2013 to discuss the terms of Plaintiffs' investment in UNC-FL. (*Id.* ¶ 12.) Thereafter, Mr. and Dr. Rusch, Mr. and Mrs. Strobel, Mr. Baur, and another individual who is not a party to this lawsuit, entered into an agreement to invest in UNC-FL. (*Id.*; Compl. ¶ 15.) Over the next year, Mr. Strobel often traveled to Florida to help Mr. Rusch develop the business. (Doc. 18-1 ¶ 13.)

The parties soon became concerned that Florida's "regulatory climate was not favorable for the development and operation of" UNC-FL; therefore, they decided to dissolve the business in Florida and reestablish it in New Mexico. (*Id.*; Compl. ¶ 18.) In 2014, Mr. Rusch formally terminated UNC-FL, and Mr. Strobel formed UNC-NM—a continuation of the cordials business— in New Mexico. (Doc. 18-1 ¶ 14.) Both Mr. Strobel and Mr. Rusch were managers of UNC-NM, and Mr. Rusch continued to communicate with Mr. Strobel via phone and email to manage the business. (*Id.* ¶¶ 14, 16.) The business utilized a certified public accountant (CPA) located in New Mexico, who "had been preparing tax returns for UNC-FL . . . since 2013, both before and after the" company relocated to New Mexico. (*Id.* ¶ 16.)

Approximately one year later, Mr. Strobel told the other parties that UNC-NM needed new capital or the business would fail. (Compl. ¶ 20.) Defendants then ceased communicating with Plaintiffs about the business. (*Id.*) Plaintiffs learned that Dr. Rusch had transferred registration of

3

the trademark to UNC-NM, but had later transferred it back to her own name without informing Plaintiffs.[2] (*See* Doc. 18-1 ¶ 15; *see also* Doc. 18-1, Ex. 11.) Plaintiffs also discovered that, since learning that UNC-NM was failing, Defendants "have sought investment or business opportunities from others, based on the representation that [Dr. Rusch] owned the V.I.P. Mark and they owned the beverage business associated with the V.I.P. Mark." (Compl. ¶ 21.) Plaintiffs assert that Defendants' actions have infringed upon UNC-NM's rights in the trademark and caused damage to Plaintiffs. (*Id.*) Plaintiffs filed suit against Defendants in this Court in July 2018. (*See* Compl.) Defendants now move to dismiss for lack of personal jurisdiction and venue. (*See* Doc. 7.)

## II.    Legal Standard

"Motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(2) test a plaintiff's theory of personal jurisdiction as well as the facts supporting personal jurisdiction. . . . When a defendant challenges the court's jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction exists." *Davis v. USA Nutra Labs*, No. CV 15-01107 MV/SCY, 2016 WL 9774945, at \*3 (D.N.M. Dec. 21, 2016) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)). "Plaintiff's burden is light in the early stages of litigation before discovery." *Arnold v. Grand Celebration Cruises, LLC*, No. CV 17-685 JAP/KK, 2017 WL 3534996, at \*3 (D.N.M. Aug. 16, 2017) (citing *Wenz*, 55 F.3d at 1505).

"[W]here there is no evidentiary hearing and the jurisdictional question is decided on the

---

[2] While the Complaint alleges that Dr. Rusch never transferred her rights in the trademark to the company (Compl. ¶ 21), Mr. Strobel asserts in his declaration that Dr. Rusch transferred her interest to UNC-NM and later transferred it back to herself (Doc. 18-1 ¶ 15). He also attaches an alleged record of the trademark held in the name of UNC-NM. (*See* Doc. 18-1, Ex. 11.) For purposes of this Opinion, the Court accepts as true the allegations that Dr. Rusch transferred her rights in the trademark to UNC-NM and later transferred the rights back to herself without consent of the parties. (*See* Doc. 18-1 ¶ 15.)

parties' affidavits and written materials, Plaintiff need only make a prima facie showing of personal jurisdiction." *Id.* (citing *Wenz*, 55 F.3d at 1505). "The plaintiff may make the required prima facie showing by coming forward with facts, via affidavit or other written materials, that would support jurisdiction over the defendant if true." *Davis*, 2016 WL 9774945, at *3 (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998)). "The Court accepts as true all well-pleaded facts (that are plausible, non-conclusory, and non-speculative) alleged by Plaintiff unless Defendant controverts those facts by affidavit." *Arnold*, 2017 WL 3534996, at *3 (citing *Shrader v. Biddinger*, 633 F.3d 1235, 1248 (10th Cir. 2011)). "The Court resolves factual disputes in the parties' affidavits in Plaintiff's favor." *Id.* (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)).

III. **Plaintiffs have met their burden to show that the Court may exercise personal jurisdiction over Defendants.**

"The Fourteenth Amendment's Due Process Clause requires that a defendant be subject to a court's personal jurisdiction before a judgment can be rendered against it." *Davis*, 2016 WL 9774945, at *3 (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 301 (1980)). "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Id.* (quoting *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995) (internal citation omitted)).

"In New Mexico, a federal court has personal jurisdiction over a nonresident defendant only to the extent that the state's long-arm statute permits." *Id.* (citing *Fid. & Cas. Co. v. Phila. Resins Corp.*, 766 F.2d 440, 442 (10th Cir. 1985), *cert. denied*, 474 U.S. 1082 (1986)). New Mexico's long-arm statute "'extends the jurisdictional reach of New Mexico courts as far as

constitutionally permissible,' such that jurisdiction is authorized by the long-arm statute only if it is permitted under the Due Process Clause." *Id.* (quoting *Tercero v. Roman Catholic Diocese*, 48 P.3d 50, 54 (N.M. 2002) (internal citation omitted); citing *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006)). "To satisfy Due Process requirements, the defendant must have (1) sufficient minimum contacts with the forum state (2) such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *McManemy v. Roman Catholic Church of Diocese of Worcester*, 2 F. Supp. 3d 1188, 1198 (D.N.M. 2013) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal citations omitted)).

A. **Defendants have sufficient minimum contacts with New Mexico.**

"A plaintiff satisfies the 'minimum contacts' standard by showing that the court may exercise either general or specific jurisdiction over the defendant." *Id.* at 1199 (citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984)). "Plaintiffs rely on specific jurisdiction as a basis for satisfying their burden . . . ." (Doc. 18 at 12.) "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotation marks and citation omitted). "[T]o exercise specific jurisdiction over a defendant, (1) the defendant must have 'minimum contacts' with the forum state such that he 'should reasonably anticipate being haled into court' there, and (2) jurisdiction must comport with 'traditional notions of fair play and substantial justice.'" *Segovia v. Rodriguez*, No. 2:17-cv-00609-BRB-GBW, 2017 WL 4480131, at *2 (D.N.M. Oct. 6, 2017) (quoting *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 613 (10th Cir. 2012) (internal quotation omitted)).

To determine whether a defendant has minimum contacts with the forum state in the tort

context, courts consider "whether the nonresident defendant 'purposefully directed' its activities

at the forum state . . . ." *Dudnikov*, 514 F.3d at 1071 (citations omitted). "[I]n contract cases,

meanwhile, [courts] sometimes ask whether the defendant 'purposefully availed' itself of the

privilege of conducting activities or consummating a transaction in the forum state." *Id.* (citations

omitted). Regardless of context, "the shared aim of [the] 'purposeful direction' doctrine . . . [is] to

ensure that an out-of-state defendant is not bound to appear to account for merely 'random,

fortuitous, or attenuated contacts' with the forum state." *Id.* (quoting *Burger King v. Rudzewicz*,

471 U.S. 462, 475 (1985) (internal quotations omitted) (alteration in original)). The Court must

also determine "whether the plaintiff's claim arises out of or results from 'actions by the defendant

*himself* that create a substantial connection with the forum state.'" *OMI*, 149 F.3d at 1091 (quoting

*Asahi Metal Ind. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 109 (1987) (internal quotations omitted)).

Here, Plaintiffs bring claims sounding in tort and in contract. (*See* Compl.) Under either

standard—purposeful direction or purposeful availment—the Court finds that Defendants have

minimum contacts with New Mexico sufficient to exercise personal jurisdiction over them.

Plaintiffs assert that Dr. Rusch purposefully directed her activities at the state because she:

- traveled to New Mexico to meet with Plaintiffs "specifically for the purpose of securing their investment and participation in the cordials business" (Doc. 18 at 13; Compl. ¶ 9);

- "participated in the organization and management of UNC-NM"[3] and "consciously availed [herself] of the advantages of transacting business in New Mexico" (Compl. ¶ 9);

- infringed upon and/or misused the trademark that belongs to UNC-NM, by causing the registration of the trademark to be transferred from the New Mexico business to her without the parties' consent (Doc. 18-1 ¶ 15) and "with the intent to injure Plaintiffs"

---

[3] The Court recognizes that the factual allegations show Mr. Rusch, more than Dr. Rusch, managed the parties' business. (*See*, *e.g.*, Compl. ¶¶ 16–17, 19.) But the facts do show Dr. Rusch participated to the extent that she took part in the parties' discussion regarding Plaintiffs' investment in UNC-FL (*id.* ¶ 14–15; Doc. 18-1 ¶¶ 11–12), she agreed to dissolve the Florida business and move the business to New Mexico (*see* Compl. ¶ 18), and she transferred the trademark to UNC-NM (Doc. 18-1 ¶ 15).

(Compl. ¶ 21); and

- collaborated with Mr. Rusch to seek "investment or business opportunities from others, based on the representation that she own[s] the V.I.P. Mark and they own[] the beverage business associated with the" trademark to the detriment of Plaintiffs and UNC-NM (*id.*).

Plaintiffs assert that Mr. Rusch purposefully directed his activities at the state because he:

- traveled to New Mexico to meet with Plaintiffs "specifically for the purpose of securing their investment and participation in the cordials business" (Doc. 18 at 13; Compl. ¶ 9);

- communicated with Plaintiffs by mail, internet, and telephone to encourage them to invest in the cordials business and later to conduct the business of UNC-NM (Compl. ¶ 9; Doc. 18-1 ¶ 7);

- dissolved UNC-FL in in order to move the company, "participated in the organization and management of UNC-NM[,]" and "consciously availed [himself] of the advantages of transacting business in New Mexico" (Compl. ¶¶ 9, 18–19; Doc. 18-1 ¶ 16);

- collaborated with Dr. Rusch to re-register the trademark in her name "with the intent to injure Plaintiffs" and the New Mexico business (Compl. ¶ 21); and

- collaborated with Dr. Rusch to seek "investment or business opportunities from others, based on the representation that she own[s] the V.I.P. Mark and they own[] the beverage business associated with the" trademark to the detriment of Plaintiffs and UNC-NM (*id.*).

Defendants insist that they do not have sufficient contacts with the forum state because "Mr. Strobel suggested and oversaw the transfer of the Company to . . . New Mexico[,]" and Mr. Rusch, trusting "Mr. Strobel's business acumen, . . . consented to the transfer." (Doc. 7 at 6–7.) Defendants contend that "[t]his was the extent of Mr. Rusch's contacts with New Mexico[,]" and that neither Defendant had "bank accounts in New Mexico, receive[d] paychecks from a New Mexico payroll account, or otherwise engage[d] in commercial activity in New Mexico." (*Id.* at 7; *see also* Docs. 7-1; 7-2.) The Court disagrees with Defendants' framing of the jurisdictional facts.

Defendants argue that their contacts with New Mexico were "Plaintiff led." (Doc. 7 at 7.) Yet Defendants conveniently forget that they pursued a business relationship with the Strobels

through phone calls, emails, mail, and visits to New Mexico. And it was Defendants—as partners in UNC-FL—who agreed to move the business to New Mexico for more favorable regulations. Defendants hoped to benefit from New Mexico's laws. Mr. Rusch, at least, continued to take an active role in managing the business in New Mexico. Defendants then transferred the trademark away from UNC-NM and sought business opportunities based on Dr. Rusch's ownership of that trademark, knowing their actions would injure Plaintiffs.

The Court is cognizant that "[a] contract between an out-of-state party and a resident of the forum state cannot, standing alone, establish sufficient minimum contacts with the forum." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004) (citation omitted). "However, 'with respect to interstate contractual obligations . . . parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities.'" *Id.* (quoting *Burger King*, 471 U.S. at 473 (internal quotation marks and citation omitted)). "In a contract case, relevant factors for assessing minimum contacts include 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Id.* (quoting *Burger King*, 471 U.S. at 479).

In *Benton*, the plaintiff (Benton) was a Colorado resident involved in a business that traded uranium. *Id.* at 1073. On behalf of his company, he entered into a Memorandum of Understanding (MOU) with the Canadian corporate defendant (Cameco) to perform certain uranium trading activities. *Id.* After a contractual due diligence review of the plaintiff's business, Cameco opted not to follow through with the MOU, and Benton sued in a Colorado district court. *Id.*

Like Defendants here, Cameco argued that it had no bank accounts, offices, employees, "or property in Colorado, [was] not licensed to do business in Colorado, . . . [did] not advertise or

solicit business in Colorado[,] and [did] not pay taxes in Colorado." *Id.* at 1076. It also argued that

Benton had solicited the transactions, none of which would occur in Colorado; it had never made

a payment to Benton in Colorado; Benton's residence in Colorado was coincidental and had "no

role in the parties' dealings"; and neither the parties' communications and execution of the MOU

nor "the economic impact of Cameco's alleged breach of contract and tortious activity on . . .

Benton's Colorado business" was sufficient to establish jurisdiction. *Id.* The district court found

that Cameco did not have sufficient minimum contacts with Colorado and declined to exercise

personal jurisdiction. *Id.* at 1074.

The Tenth Circuit reversed.[4] The court found that Cameco had minimum contacts with

Colorado due to the parties' continuing relationship (including both "prior negotiations" and

"contemplated future consequences"), Benton made decisions for his company while situated in

its principal place of business (Colorado), and the dispute concerned "the conduct of the parties in

redefining their business relationship." *Id.*at 1077. The Court explained that "[b]y engaging in a

business relationship with . . . Benton, who operate[d] his business from Colorado, Cameco

'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus

invoking the benefits and protections of its laws.'" *Id.* (quoting *Burger King*, 471 U.S. at 475

(internal quotation marks and citation omitted)). The Tenth Circuit also noted the parties' phone

calls and letters exchanged during the MOU negotiations, as well as the fact that Cameco sent

employees to the state to conduct a due diligence review. *Id.* While these latter facts alone were

not enough to establish minimum contacts, together, they helped establish that "Cameco

purposefully and knowingly availed itself of a business opportunity in Colorado." *Id.*

---

[4] The Tenth Circuit reversed the district court's ruling as to the question of minimum contacts, but it found that exercising jurisdiction over Cameco, a Canadian company, would offend traditional notions of fair play and substantial justice. *Benton*, 375 F.3d at 1074.

The facts here present an even more compelling case for exercising personal jurisdiction than the "very close case" in *Benton*. *See id.* at 1076. While the parties' initial agreement centered on a business in Florida, there would have been no agreement had Defendants not actively pursued a relationship with Plaintiffs, whom Defendants knew to reside in New Mexico. As in *Benton*, Defendants came to "the forum state[] in order to maintain and further [the] business relationship" they sought. *Id.* at 1077.

More importantly, Defendants agreed that the parties' business would not thrive under Florida's regulatory framework, and they sought to take advantage of New Mexico's laws (and the services of at least one CPA) instead. Defendants moved their business to New Mexico, had regular contact with the New Mexico Plaintiffs via telephone, mail, and internet, and later took an active role in the business when it was situated in New Mexico. And, as is required to establish minimum contacts, Plaintiffs' claims arise out of the actions Defendants took to establish their connection with New Mexico—the claims center on the parties' agreement and Defendants' alleged breach of that agreement. The Court is confident that the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[,]" are sufficient to establish that Defendants have minimum contacts with New Mexico. *See TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.*, 488 F.3d 1282, 1288 (10th Cir. 2007) (quoting *Burger King*, 471 U.S. at 479); *see also Syntroleum Corp. v. Fletcher Int'l, Ltd.*, No. 08-cv-384-JHP-FHM, 2008 WL 4936503, at *4–5 (N.D. Okla. Nov. 17, 2008) (finding that the defendant's "contacts in the aggregate[,]" including that defendant initiated the parties' investment discussions, corresponded with plaintiff in the forum, made a due diligence trip to the forum, and had a continuing business relationship with corresponding obligations, were sufficient "to support an exercise of personal jurisdiction").

Defendants argue that the exercise of personal jurisdiction is improper for two additional reasons. First, they contend that the "no-imputed-contacts" rule applies. (Doc. 7 at 7.) In *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013), the Tenth Circuit recognized that "[j]urisdiction over a corporation in a particular forum does not automatically confer jurisdiction over that corporation's employees." 722 F.3d at 1275. Instead, a court must determine whether it has jurisdiction over employees according to the employees' own contacts with the state; the "[e]mployees' 'contacts with [the forum state] are not to be judged according to their employer's activities there.'" *Id.* (quoting *Calder v. Jones*, 465 U.S. 783, 890 (1984)). Defendants assert that "[t]he fact that this Court has jurisdiction over UNC-NM is irrelevant for purposes of establishing personal jurisdiction over Defendants because Defendants' *own activities* in the forum state were completely nonexistent." (Doc. 7 at 8.) The Court has already found (and explains in more detail below) that Defendants' own contacts and activities created a substantial connection with New Mexico. Consequently, the no-imputed-contacts rule does not protect Defendants.

Second, Defendants believe that they are protected by the fiduciary shield doctrine. (*Id.*) "The fiduciary or corporate shield doctrine prevents a state from exercising personal jurisdiction over individual officers or directors of a corporation based on actions they have taken in a fiduciary capacity for the corporation." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 42 P.3d 1221, 1237 (N.M. Ct. App. 2001) (citing *Allen v. Toshiba Corp.*, 599 F. Supp. 381, 384 (D.N.M. 1984)). The doctrine provides greater protection than the no-imputed-contacts rule, but its protection is not absolute.[5] *See Newsome*, 722 F.3d at 1275; *Santa Fe Techs.*, 42 P.3d at 1237; *see also Smith v.*

---

[5] The no-imputed-contacts rule and the fiduciary shield doctrine are similar, but are rooted in different considerations. "[T]he no-imputed contacts rule flows from considerations of due process, whereas the fiduciary shield doctrine does not enjoy constitutional status." *Newsome*, 722 F.3d at 1275. Instead, it is "a matter of state law . . . ." *Id.* at 1276 (citation omitted). The fiduciary shield "doctrine is not constitutionally required in New Mexico." *Santa Fe Techs.*, 42 P.3d at 1237.

*Cutler*, 504 F. Supp. 2d 1162, 1169 (D.N.M. 2007).

In *Santa Fe Technologies*, a case that also "involve[d] a failed business venture between" the parties, the court found that it had jurisdiction over an individual defendant (Jannetta) who was also CEO of the defendant company.[6] 42 P.3d at 1226, 1231. The facts showed that Jannetta "actually participated in the commission of [the alleged] business tort . . . ." *Smith*, 504 F. Supp. 2d at 1169 (discussing *Santa Fe Tech.*, 42 P.3d at 1237). The New Mexico Court of Appeals found that, in "[l]ooking to the [parties'] 'prior negotiations and contemplated future consequences,'" Jannetta's actions "demonstrate[d] an intent to do business . . . in New Mexico and with a New Mexico company." *Santa Fe Tech.*, 42 P.3d at 1231 (quoting *Far W. Capital*, 46 F.3d at 1079 (internal quotation marks and citation omitted)). The court found that the fiduciary shield doctrine was inapplicable where Jannetta was a "primary participant" in the alleged wrongs. *Id.* at 1237.

"The equitable rationale which underlies the fiduciary shield doctrine is that 'it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.'" *Smith*, 504 F. Supp. 2d at 1169 (quoting *Allen*, 509 F. Supp. at 384 (internal quotation omitted)). It is undisputed that here, before Plaintiffs invested in the business, Mr. Rusch was the sole partner in UNC-FL and Dr. Rusch held the trademark for the benefit of UNC-FL. Shielding either Defendant on the basis of the fiduciary shield doctrine makes little sense, when Defendants *were* the business. The Court finds that the fiduciary shield doctrine does not apply to Defendants.

---

[6] *Santa Fe Technologies* involved several individual defendants, but only one claimed the protection of the fiduciary shield doctrine. *See* 42 P.3d at 1226–28, 1236–37.

**B.** **Exercising jurisdiction comports with traditional notions of fair play and substantial justice.**

Defendants argue that even if the Court finds they have minimum contacts with New Mexico, it would offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over them. (Doc. 7 at 10–11.)

> In assessing whether an exercise of jurisdiction is reasonable, [the Court] consider[s]: [a] the burden on the defendant, [b] the forum state's interest in resolving the dispute, [c] the plaintiff's interest in receiving convenient and effective relief, [d] the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and [e] the shared interest of the several states in furthering fundamental social policies.

*Benton*, 375 F.3d at 1078 (quoting *OMI*, 149 F.3d at 1095 (internal citation omitted)). "The analyses of minimum contacts and reasonableness are complementary . . . ." *Id.* "[T]he weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Id.* (quoting *OMI*, 149 F.3d at 1092 (internal citations omitted)). Conversely, "an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts]." *Id.* (quoting *OMI*, 149 F.3d at 1092 (internal citations omitted)). Defendants carry the burden "to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Dudnikov*, 514 F.3d at 1080 (quotation marks and citations omitted).

**1.** **Litigating this lawsuit in New Mexico will not place a substantial burden on Defendants.**

The Supreme Court has noted that "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engaged in economic activity . . . ." *Burger King*, 471 U.S. at 474 (quotation omitted). While Defendants are "nearly 2,000 miles from" New Mexico (*see* Doc. 7 at 10), they were able to travel that distance

to convince the Strobels to invest in their business. And because the parties are in three locations—New Mexico, Florida, and Canada—someone will have to travel. Defendants have not shown that their burden is substantial, particularly where the business they invested in and its CPA are located in New Mexico. This factor slightly favors the exercise of jurisdiction.

### 2. New Mexico has an interest in litigating a dispute involving an LLC formed in the State.

"States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *Res. Assocs. Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free Sch. Dist.*, 193 F. Supp. 3d 1200, 1245 (D.N.M. 2016) (quoting *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1062 (10th Cir. 2008) (internal quotation omitted)). "This factor favors New Mexico's exercise of jurisdiction over [Defendants], because [UNC-NM] is a New Mexico" business chartered in the state, and Mr. and Mrs. Strobel are New Mexico residents and members of UNC-NM. *See id.* This is true despite the fact that the business was originally formed in Florida. This factor slightly favors the exercise of jurisdiction.

### 3. Plaintiffs could receive effective relief elsewhere.

"This factor hinges on whether [Plaintiffs] may receive convenient and effective relief in another forum." *Benton*, 375 F.3d at 1079 (quotation omitted). This factor would be more significant if Plaintiffs' "chances of recovery will be greatly diminished by forcing [them] to litigate in" Florida due to the state's laws or the burden of out-of-state litigation. *Id.* (quotation omitted). Here, Plaintiffs have traveled to Florida for pleasure in the past, they invested in a Florida company, and Mr. Strobel traveled to Florida to participate in the management of UNC-FL. It would not be a burden for Plaintiffs to litigate in Florida. Thus, this factor is neutral or weighs slightly against the exercise of personal jurisdiction.

### 4. New Mexico will provide an efficient location to litigate.

"This factor asks whether the forum state is the most efficient place to litigate the dispute." *Res. Assocs.*, 193 F. Supp. 3d at 1250 (internal quotation marks and citation omitted). Plaintiffs assert that this factor weighs in favor of the exercise of jurisdiction because New Mexico "is where Plaintiffs reside, their damages have been suffered," and it is where UNC-NM's headquarters, CPA, and financial records are located. (Doc. 18 at 15.) Defendants argue that as Plaintiffs originally undertook to engage in business in Florida, that forum would be the most convenient. (Doc. 7 at 11.) Unlike in *Benton*, however, Defendants have not asserted that Florida law will govern the entirety of Plaintiffs' claims. *See Benton*, 375 F.3d at 1080. The Court finds that because the business's headquarters, CPA, and financial records are located in New Mexico, and because it is not clear that Florida law will govern all of Plaintiffs' claims, this factor weighs slightly in favor of the exercise of jurisdiction.

### 5. The shared interests of the states will not be affected by litigating in New Mexico.

The final "factor considers all of the relevant states' interests in 'advancing fundamental substantive social policies.'" *Res. Assocs.*, 193 F. Supp. 3d at 1250 (quoting *OMI*, 149 F.3d at 1097). Neither party focused on this factor. Plaintiffs stated that "Defendants have shown no reason why the social policy interests of any other state would be adversely affected by having Plaintiffs' claims adjudicated in New Mexico." (Doc. 18 at 15.) Defendants did not reply to this statement. (*See* Doc. 19 at 7–8.) As such, this factor does not weigh heavily in favor of either party.

Upon balancing these factors, the Court finds that exercising jurisdiction over Defendants comports with due process. Consequently, the Court will deny Defendants' motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.

**IV.    Venue is proper in this District.**

Defendants also argue that venue is inappropriate in New Mexico. (Doc. 7 at 11–12.)

In a diversity action, venue lies in
"(1) a judicial district where any defendant resides, . . . (2) a judicial district in
which a substantial part of the events or omissions giving rise to the claim occurred,
. . . or (3) a judicial district in which any defendant is subject to personal jurisdiction
at the time the action is commenced, if there is no district in which the action may
otherwise be brought."

*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1165 (10th Cir. 2010) (quoting 28

U.S.C. § 1391(a)(1)–(3)). At issue here is § 1391(a)(2). "Under that provision, venue is not limited

to the district with the *most* substantial events or omissions." *Emp'rs Mut.*, 618 F.3d at 1165–66

(citations omitted). "Section 1391(a)(2) instead contemplates that venue can be appropriate in

more than one district . . . [and] permits venue in multiple judicial districts as long as a substantial

part of the underlying events took place in those districts." *Id.* (quotation marks and citation

omitted).

The Court is to "conduct a two-part analysis when reviewing challenges to venue under

§ 1391(a)(2). First, [the Court] examine[s] the nature of the plaintiff's claims and the acts or

omissions underlying those claims." *Id.* (citations omitted). In this action, the Florida-based

Defendants persuaded the New Mexico-based Plaintiffs to invest in a Florida-based business.

Defendants contacted Plaintiffs in New Mexico via telephone, mail, and internet, and they traveled

to New Mexico to discuss the business. The parties met in Arizona to finalize the agreement. The

parties initially managed and promoted the business in Florida. Defendants eventually dissolved

the Florida-based business in order to take advantage of New Mexico's more favorable regulations,

and the parties continued to manage the business, now headquartered in New Mexico. The parties'

utilized a New Mexico CPA—even while the business was still headquartered in Florida. The

business's financial records are in New Mexico. Defendants, presumably acting from Florida, transferred the trademark away from the New Mexico-based business and took other actions to use the trademark for their own gain, knowing those actions would injure the business and Plaintiffs. Plaintiffs now bring tort- and contract-based claims to recover damages.

In the second step, the Court must "determine whether substantial events material to those claims occurred in the forum district." *Id.* (quotation marks and citations omitted). Events are substantial if the "acts and omissions . . . have a close nexus to the alleged claims." *Id.* (quotation marks and citations omitted). Here, the Court does not rely on Defendants' communications to Plaintiffs in New Mexico to find venue is proper, but on Defendants' shared decision to dissolve the Florida business and move it to New Mexico, their actions to manage and promote the New Mexico business, and their subsequent actions that harmed the New Mexico business and Plaintiffs. In sum, "the brunt of the injury in this case will be suffered" in part by New Mexico residents and a "New Mexico business, and involves interference with" a business formed in this state to take advantage of New Mexico's favorable regulations. *See Lopez v. Killian*, No. 10CV0882 JCH/GBW, 2012 WL 13080169, at \*5 (D.N.M. Mar. 2, 2012). The Court finds that there is a sufficiently close nexus between Defendants' acts and Plaintiffs' claims, and venue is proper in this District under 28 U.S.C. § 1391(a)(2).

**THEREFORE**,

**IT IS ORDERED** that the Motion to Dismiss of Defendants Uwe Rusch and Mabel Rusch Pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(3) (Doc. 7) is **DENIED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE