## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

VOLKER STROBEL, HEIKE
STROBEL, and HANS BAUR,
in their individual capacities and on
behalf of UNC Holdings LLC,

           Plaintiffs/Counterclaim Defendants,

v.                                        No. CIV 1:18-00656-RB-JFR

UWE RUSCH and DR. MABEL
RUSCH,

           Defendants/Counterclaim Plaintiffs.

## <u>MEMORANDUM OPINION AND ORDER</u>

      Mr. Uwe Rusch began developing a brand of cordials in 1998 under the name CORDIALS

V.I.P. Drinks. Mr. Rusch asserted ownership in the copyright to the brand and also registered the

trademark to the brand's logo (the "Royal Logo"), which has been used to sell CORDIAL V.I.P.

Drinks since 2005, primarily in Europe. In 2012, he formed UNC Holding LLC ("UNC-FL") in

Florida to establish his business in the United States. In 2013 Mr. Volker Strobel, Mrs. Heike

Strobel, Mr. Hans Baur, and Mr. Gregor Fischer agreed to invest money with Defendants in the

CORDIALS V.I.P. Drinks business. At some point, their business relationship soured, and the

parties agreed to dissolve UNC-FL. Plaintiffs contend that Defendants violated the parties'

agreement and brought this lawsuit for a variety of tort and contract claims. Defendants filed

multiple counterclaims and argue that Plaintiffs' actions infringed on their rights and made any

purported contract unenforceable. Both parties move for summary judgment to dismiss the claims

and counterclaims. The Court will deny both motions in part.

I.    **Statement of Facts**[1]

In or around 1998, Mr. Rusch began developing a line of cordials. (Doc. 145 (Am. Answer and Counterclaims) ¶ 10.) He registered the CORDIALS V.I.P. Drinks logo as an international trademark through the World Intellectual Property Organization (WIPO) and later transferred ownership of the V.I.P. Mark to his wife, Dr. Mabel Rusch. (Doc. 62 ¶ 13.)

In 2012, Mr. Rusch organized UNC, Holdings LLC (UNC-FL) (Doc. 114-3 at 5), and the next year he entered agreements with new investors, consisting of Volker Strobel, Heike Strobel, Hans Baur and Gregor Fischer. (Doc. 114-5 at 2–5.) The total investment of the parties was $450,000, with Volker Strobel, Heike Strobel, Hans Baur investing $350,000, and Gregor Fischer investing $100,000. (*Id*. at 2.) In connection with their investments, the parties set up two new companies in conjunction with UNC-FL: V.I.P. Drinks Bottling, LLC and V.I.P. Drinks Distribution, LLC. (Doc. 114-5 at 2.) The parties agreed that Mr. Rusch and the four new investors would own the following percentages of each of the three cordials business entities: Mr. Rusch— 46 percent; Mr. Strobel—23 percent; Mrs. Strobel—5 percent; Mr. Baur—6 percent; Mr. Fischer—10 percent. (Doc. 114-5 at 2–3.) Mr. Rusch added Mr. Strobel as a manager of UNC-FL (Doc. 114-3 at 19), and Mr. Rusch and Mr. Strobel served as CEO and CFO, respectively. (Doc. 114-5 at 4.)

The membership was complete pursuant to the Partnership Agreement of UNC, Holdings LLC. (Doc. 41-1.) The agreement outlined the roles and responsibilities of all the parties and allowed for Mr. Strobel and Mr. Rusch to both "manage the Holding's business affairs as equal managing members." (Doc. 41-1 at 2.) As to Dr. Rusch, the contract stated that she was to "undertake[] to convey to the Holding all rights to the CORDIALS trademark and all rights to the

---

[1] The Court finds the brevity of the Statement of Facts to be a direct result of this case's lack of evidence and abundance of argument.

design and logos of CORDIALS products . . . [and] [t]he transfer of ownership of these rights will be initiated immediately after the signing of this agreement."[2] (*Id.*) The contract declared that "[t]he costs of this transfer will be borne by [UNC, Holding LLC]." (*Id.*) In addition to the responsibilities demanded by the contract, Mr. Rusch also made an oral agreement to "transfer the trademark rights into the company." (Doc. 114-3 at 6.)

In August of 2013, Mr. Strobel sent an email to all members confirming that the transfer of the trademark by Dr. Rusch to UNC-FL had been initiated and confirmation would take a few weeks. (Docs. 115-2 at 3; 115-4 at 4.) Nearly a year later, in June of 2014, Mr. Strobel received an email from Mr. Rusch, forwarded from WIPO, explaining the fees to be paid by the Holding to transfer the trademark. (Doc 115-4 at 5.) During the same month, Dr. Rusch signed the WIPO Form MM5(E), titled Request for the Recording of a Change of Ownership. (Doc. 115-1.) Eventually, though, Dr. Rusch receive a letter from WIPO stating that the trademark would expire if not renewed. (Doc. 115-1 at 3, 16.) It soon became apparent to all parties that the V.I.P. mark had not been transferred to UNC-FL. (Doc. 115-2 at 3.) In the end, the trademark was never transferred to UNC-FL, and in 2017 Dr. Rusch renewed the registration of the mark in her name. (Doc. 62 ¶ 22.)

In 2014, Mr. Rusch filed Articles of Dissolution of UNC-FL with the Florida Secretary of State.[3] (Doc. 114-3 at 20.) Mr. Strobel alleges that in April 2014 he and Mr. Rusch agreed to dissolve UNC-FL and to create a new company and relocate to New Mexico. (Doc. 114-5 at 2.) In that same year, Mr. Strobel filed Articles of Organization for UNC-NM with the New Mexico

---

[2] Prior to entering the agreement, Mr. Rusch was the owner of the trademark. He placed ownership of registration of the mark in his wife's name in the event of his death. (Doc. 114-3 at 24.) Other than owning the mark, Dr. Rusch was not involved in the cordials business, which was kept separate from her. (*Id.*)

[3] In 2015 Mr. Rusch filed Articles of Dissolution for V.I.P. Drinks Distribution, LLC with the Florida Secretary of State. (Doc. 114-5 at 2.)

Secretary of State. (*Id.* at 22.) At some point in 2016, the business became insolvent (Docs. 62 ¶ 21; 114-3 at 2), and essentially lay dormant from 2016 until early 2018 with no customers or revenues. (Doc. 114-3 at 2, 3.)

## II.    Legal Standards

### A.    Standard for Cross Motions for Summary Judgment

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). The party opposing a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). Rule 56(c) provides that "[a] party asserting that a fact . . . is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The respondent may not simply "rest on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 259. Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008) (citing Fed. R. Civ. P. 56(e); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).

"Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Osuagwu v. Gila Reg'l Med. Ctr.*, 938 F. Supp. 2d 1142, 1146 (D.N.M. 2012) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (internal citations omitted)). "Even where the parties file cross motions pursuant to Rule 56, summary judgment is 'inappropriate if disputes remain as to material facts.'" *Id.* (quoting *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000)). "[W]hen faced with cross-motions for summary judgment, the Court is 'entitled to assume that no evidence needs to be considered other than that filed by the parties.'" *AT & T Mobility Servs., LLC v. Vill. Of Corrales*, 127 F. Supp. 3d 1169, 1172 (D.N.M. 2015) (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

III.    **The Court grants in part the Rusches' Motion for Summary Judgment**

Plaintiffs bring an assortment of claims against Defendants—eight to be exact. They include allegations of Trademark Infringement, False Designation of Origin, Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Breach of New Mexico Unfair Practices Act (NMUPA), Breach of Fiduciary Duty, Conversion, and Prima Facie Tort. In return, Defendants filed a Motion for Summary Judgment disputing these accusations. The Court grants Defendants' motion as to all claims but one—Breach of Contract by Dr. Rusch. There, the Court finds the issue of whether Dr. Rusch fulfilled her obligation to "undertake to convey" the mark as disputable. The Court will explain its reasoning as to all counts below.

a)   **Count I - Trademark Infringement**

Defendants contend that Plaintiffs do not have a cause of action for common law trademark infringement because the trademark was never registered in New Mexico. (Doc. 146 at 12.) Plaintiffs respond that "there is no basis for Defendants' contention that Plaintiffs' claim is based on New Mexico common or statutory law." (Doc. 138 at 12.) No matter the statutory grounding of the claim, Plaintiffs have not proffered any evidence to show that the mark was registered to Plaintiffs under either New Mexico or Federal law.[4] *See* N.M. Stat. Ann. § 57-3B-14 ("Any person shall be liable in a civil action by the registrant . . . ." A registrant "includes the person to whom the registration of a mark under the Trademark Act is issued as well as the legal representative, successors or assigns of the person."); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013) (citing *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research,* 527 F.3d 1045, 1050 (10th Cir. 2008) (stating that prevailing on a trademark infringement claim is

---

[4] Plaintiffs argue that the "renewal of The Trademark in [Dr. Rusch's] own name would be subject to a constructive trust in favor of UNC-NM." (Doc. 138 at 12.) If this is Plaintiffs' main contention, then the argument should have been made under a constructive trust theory, not as a Trademark Infringement claim.

dependent on an individual proving, among other things, that they have a protectable interest in the mark). Since N.M. Stat. Ann. § 57-3B-14 and 15 U.S.C. § 1114(1)(a) stipulate that causes of action are limited to registrants, and Plaintiffs make no showing that they are the registrants, they cannot maintain a cause of action. Accordingly, the Court will grant Defendants' motion and dismiss Count I – Trademark Infringement. (Doc. 62 ¶¶ 26–28.)

### b)   Count II – False Designation of Origin

Plaintiffs claim they "have ample evidence to support a claim for false designation of origin under Section 43 of the Lanham Act . . . ." (Doc. 138 at 13.) "Section 43(a) of the Lanham Act, prohibiting the use of false designations of origin, protects against service mark infringement even if the mark has not been federally registered." *Donchez v. Coors Brewing Co*., 392 F.3d 1211, 1215 (10th Cir. 2004) (quoting *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 522 (4th Cir. 2002)). To succeed under § 43(a), a plaintiff must establish "(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used 'an identical or similar mark' in commerce, . . . ; and (3) that the defendant's use is likely to confuse consumers." *1-800 Contacts, Inc.*, 722 F.3d at 1238 (citing *Donchez*, 392 F.3d at 1215) (subsequent citation omitted). "[T]he registration of a mark serves as prima facie evidence of both the mark's validity and the registrant's exclusive right to use it in commerce . . . ." *Id.* (citing 15 U.S.C. § 1115(a)). This Court previously concluded that "the trademark's registration record reflects ownership by Dr. Rusch . . . ." (Doc. 75 at 8.) Not only do Plaintiffs offer zero case law to buttress their assertion that they have a "protectable interest" (Doc. 138 at 13), but they actually admit that the mark is "registered in Dr. Rusch's name" and that "registration may be available . . . to one who *owns* a trademark." (Doc. 138 at 2, 12 (emphasis added).) Since Plaintiffs agree that Dr. Rusch owns the mark, they have failed to show they have a "protectable interest." Plaintiffs fail to meet the first element.

As to the third element, even if Plaintiffs could show that Defendants used an "identical or similar mark" in commerce, which they did not, they cite no specific instances of Defendants "causing confusion to the investing and consuming public with respect to the ownership of The Trademark." (Doc. 138 at 14.) As noted above, a party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co.*, 2008 WL 2309005, at *1 (citing Fed. R. Civ. P. 56(e); *Argo*, 452 F.3d at 1199). Therefore, Plaintiffs also fail to meet the third element. As Plaintiffs have failed to come forward with evidence to support their claim, the Court will grant Defendants' motion and dismiss Count II – False Designation of Origin. (Doc. 62 ¶¶ 29–31.)

### c) Count III – Breach of Contract

#### a. Dr. Rusch

Plaintiffs' third claim is for breach of contract against both Mr. and Dr. Rusch. This claim is premised entirely on the Rusches' failure to convey the trademark and copyright. As to Dr. Rusch, Defendants contend the claim should be dismissed because Dr. Rusch fulfilled her duties under the Partnership Agreement, and therefore, did not breach her contractual obligations. (Doc. 115 at 19–20.) "Under New Mexico law, '[t]he elements of a breach-of-contract action are the existence of the contract, breach of the contract, causation, and damages.'" *Anderson Living Tr. v. Conoco Phillips Co., LLC*, 952 F. Supp. 2d 979, 1030 (D.N.M. 2013) (quoting *Abreu v. N.M. Children, Youth & Families Dep't*, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)). The Partnership Agreement provides that Dr. Rusch "hereby undertakes to convey to the Holding all rights to the CORDIALS trademark . . . ." (Doc. 41-1 at 2.) The next paragraph states that "[t]he transfer of ownership of these rights will be initiated immediately after the signing of this agreement." (*Id.*)

The Court must therefore consider whether Dr. Rusch fulfilled her obligation to "undertake to convey" the mark.

The Court's decision hinges on the second element—whether Dr. Rusch breached the contract. Plaintiffs claim that Dr. Rusch breached the contract because she "failed to fulfill [her] obligation to assign ownership and registration of The Trademark to UNC-FL in the immediate aftermath of the entry of their 2013 Agreement." (Doc. 138 at 14.) Defendants have offered testimony disputing this contention, arguing that Dr. Rusch executed the necessary transfer documents, but Mr. Strobel, who was allegedly responsible for submitting the documents and the appropriate payments to finalize the transfer, never took the necessary follow-up actions. (Docs. 115 at 19; 115-1 at 4–5, 11–14.) Mr. Strobel avers that Dr. Rusch failed to initiate the transfer of ownership of the mark to UNC-FL, and that it was Dr. Rusch's job to then submit documentation, not Mr. Strobel's. (Doc. 141-1 at 1, 2.) Mr. Strobel stated, "I never prepared paperwork to submit to WIPO to effect transfer of ownership of The Trademark; nor did I present such papers to Dr. Rusch for her signature; nor did I take any such documents from her to mail to WIPO." (*Id*. at 2.) Mr. Strobel concluded that preparing the paperwork "was [Dr. Rusch's] responsibility under the Partnership Agreement . . . signed in late April and early May 2013." (*Id*.) Because there is a genuine factual dispute about whether Dr. Rusch's alleged inaction constitutes a breach of the contract, this claim must go to the jury. Under New Mexico law, "[b]reach of contract is a question of fact . . . ." *Hunt v. Cent. Consol. Sch. Dist.*, 951 F. Supp. 2d 1136, 1196 (D.N.M. 2013) (citing *Collado v. City of Albuquerque*, 45 P.3d 73, 76 (N.M. Ct. App. 2002)); *see also United States v. Bd. of Cty. Comm'rs of the Cty. of Dona Ana, N.M.*, 730 F. Supp. 2d 1327, 1339 (D.N.M. 2010) ("A breach-of-contract claim is a legal issue, requiring a factual inquiry that can be done by a jury.") (citation omitted). "Whether a breach rises to the level of being considered a material breach

is a question of fact." *Lassiter v. Topeka Unified Sch. Dist. No. 501*, 347 F. Supp. 2d 1033, 1041 (D. Kan. 2004) (citing *Elec. Distribs., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1086 (10th Cir. 1999)) (subsequent citation omitted). Under the disputed facts at issue, a reasonable jury could find that Dr. Rusch satisfied (or did not satisfy) her contractual obligations. Because both sides raise conflicting factual disputes as to whether Dr. Rusch undertook to convey the mark, and this fact likely influences the determination of the claim, the Court denies Defendants' motion as to Count III – Breach of Contract – against Dr. Rusch. (Doc. 62 ¶¶ 32–34.)

### b. Mr. Rusch

As to Mr. Rusch, Plaintiffs claim he "registered [the] copyright . . . in his own name . . .[,] breaching his obligation to the Plaintiffs." (Doc. 138 at 16.) Because this is a breach of contract claim, the Court must first address whether Mr. Rusch even had a contractual obligation to Plaintiffs regarding the transfer of the intellectual property. The contract states:

> Mrs. Mabel Rusch hereby undertakes to convey to the Holding all rights to the CORDIALS trademark and all rights to the design and logos of CORDIALS products, at no cost and without legal limitation as to time, space, or content. Mrs. Mabel Rusch affirms that she has unqualified ownership of all aforementioned rights and no third party holds any rights to and/or interest in these rights, that these rights have been neither pledged and/or collateralized, that these rights are not the object of any threatened or pending legal disputes with third parties.
>
> The transfer of ownership of these rights will be initiated immediately after the signing of this agreement. The costs of this transfer will be borne by the Holding. This transfer of rights takes place given the interest of her husband, Mr. Uwe Rusch, in the Holding. **They are part of the package of CORDIALS rights that Mr. and Mrs. Rusch are contributing to the Holding**.

(Doc. 41-1 at 2 (emphasis added).) After the Court has read the contract, it must then determine whether the contract is ambiguous. *See Mendoza v. Isleta Resort & Casino*, 460 P.3d 467, 473 (N.M. 2020) ("A contract is ambiguous only when it is 'reasonably and fairly susceptible' to

alternate constructions.") (quoting *Lenscrafters, Inc. v. Kehoe*, 282 P.3d 758, 763 (N.M. 2012));

*see also Evanston Ins. Co. v. Desert St. Life Mgmt.*, 434 F. Supp. 3d 1051, 1089 (D.N.M. 2020)

("When interpreting contracts, 'courts should not 'create ambiguity where none exists.'") (quoting

*United Nuclear Corp. v. Allstate Ins. Co*., 285 P.3d 644, 647 (N.M 2012)). The contract states that

Mr. and Dr. Rusch were to convey "the package of CORDIALS rights," but it never defines what

those rights are. (Doc. 114-3 at 6.) Consequently, a reader of the contract does not know whether

the "rights" include the trademark (Dr. Rusch's obligation) and/or the copyright (Mr. Rusch's

obligation). Because of this, the contract language identifying the "rights" Mr. and Dr. Rusch were

to contribute is ambiguous.

Though the contract does not define what rights were to be conveyed, Mr. Rusch stated

that when the parties signed the contract, he said he "agreed to transfer the trademark rights into

the company and my recipes into the company." (Doc. 114-3 at 6.) Mr. Rusch's statement is helpful

to interpret what the contract meant by "package of CORDIALS rights," but it is also an agreement

that was made contemporaneously with the signing of the contact. (*Id*.) Therefore, the timing of

this oral statement triggers the parol evidence rule. *See Deckard v. Gen. Motors Corp*., 307 F.3d

556, 563 (7th Cir. 2002) ("The parol evidence rule excludes evidence of prior or contemporaneous

oral and written agreements which would vary a written contract.") (citations omitted).

The Court must now determine if the parol evidence rule would allow Mr. Rusch's oral

agreement to be used to supplement the contract. "It is only when the trial court determines that a

contract is ambiguous that extrinsic evidence is admissible to clarify the parties' intent." *Baum v.

Great W. Cities, Inc., of N.M.*, 703 F.2d 1197, 1205 (10th Cir. 1983) (citing *Young v. Thomas*, 604

P.2d 370 (N.M. 1979)). "[T]he parol evidence rule does not forbid two contemporaneous contracts,

one written and one oral, with respect to the same subject matter, providing the two can be made

to stand together without the oral contract affecting the integrity of the written one." *Id*. ). "[C]ontracting parties have the power to reduce some portions of their total contract to writing and leave other portions to oral expressions only." *Id*. at 1206. "However, under such circumstances, the oral expressions are legally significant only if they are not contradictory and have some effect upon the interpretation, application and legal operation of the written portion." *Id*. (citation omittd). The Court finds that Mr. Rusch's oral agreement supplements, but does not contradict, the Partnership Agreement. The oral agreement gives a clearer meaning to what "the package of CORDIALS rights" includes: both the trademark and the copyright. Because of this, Mr. Rusch was contractually obligated to transfer his ownership of the copyright.

Because Defendants do not dispute that Mr. Rusch breached his contractual obligations, the second element is not at issue. Instead, Plaintiffs' claim fails on the third and fourth elements. Defendants argue that Plaintiffs cannot prove causation, because while Mr. Strobel did not transfer the V.I.P. Mark, "the parties operated as if the intellectual property had been transferred to UNC-FL." (Doc. 115 at 22.) Plaintiffs marshal no evidence to counter this assertion, nor do they allege facts to show that Mr. Rusch's breach caused them any damages. Because they have failed to produce evidence to support their breach of contract claim, the Court will dismiss Count III against Mr. Rusch. (Doc. 62 ¶¶ 32–34.)

### d) Count IV – Breach of Covenant of Good Faith and Fair Dealing

Plaintiff state that "there is ample evidence that both Dr. Rusch and Mr. Rusch acted in bad faith in refusing to transfer their respective rights, as specifically required by the 2013 Partnership Agreement they entered . . . ." (Doc. 138 at 16.) "Under New Mexico law, '[w]hether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement.'" *Anderson Living Tr.*, 952 F. Supp. 2d at 1031 (quoting *Watson Truck & Supply*

*Co., Inc. v. Males*, 801 P.2d 639, 642 (N.M. 1990)). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Id*. (quoting *Watson Truck & Supply Co.*, 801 P.2d at 642). "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Id*. (quoting *Sanders v. FedEx Ground Package Sys.*, 188 P.3d 1200, 1203 (N.M. 2008)). "A cause of action for breach of an implied covenant of good faith and fair dealing cannot prevail without an accompanying showing for breach of a contract." *Aguilar v. Las Cumbres Learning, Inc.*, No. 1:06-CV-1100, 2008 WL 4107137, at *18 (D.N.M. Apr. 26, 2008) (citing *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 925 (N.M. 2003); *Martinez v. N.M. Dep't of Health,* No. CIV 04–1326 JB/RLP, 2006 WL 4079690, at *14 (D.N.M. Dec. 4, 2006)). "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 856 (N.M. 1994) (citation omitted).

Defendants contend that "the cause of Plaintiffs' loss of investment was not the failure to transfer the V.I.P. Mark to UNC-FL, because from the inception of the business through at least the spring of 2015, the parties operated as if the intellectual property had been transferred to UNC-FL." (Doc. 115 at 22.) Plaintiffs allege no facts to the contrary against either Mr. or Dr. Rusch. They note no instances in which the omission of transfer caused them to be denied their benefits of the contract, and there is no evidence in the record regarding motive or intent. Because they have failed to produce evidence to support their claim, the Court will dismiss Count IV- Breach of Covenant of Good Faith and Fair Dealing. (Doc. 62 ¶¶ 35–37.)

### e) Count V – Breach of New Mexico Unfair Practices Act (NMUPA)

Plaintiffs claim that they "have shown an adequate factual basis for pursuing their claim for breach of the UPA." (Doc. 138 at 17.) The NMUPA defines an "unfair or deceptive trade practice" as "an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . ." N.M. Stat. Ann. § 57-12-2. Hence, statements in violation of the NMUPA must be "made in connection with the sale, lease, rental or loan of goods." *Id.* Here, Plaintiffs state that "Defendants' misrepresentation that Dr. Rusch was entitled to ownership of The Trademark . . . is the core of Plaintiffs' UPA claim." (Doc. 138 at 17.) Plaintiffs further state that Mr. Rusch's "refusal to have his wife transfer The Trademark is willful and supports Plaintiffs' UPA claim." (*Id.* at 18.) But Defendants' statements that Plaintiffs call into question refer only to the transfer of the trademark's ownership. (Doc. 138 at 17.) NMUPA claims are to be brought in connection the sale of goods or services by consumers. *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 708 F. Supp. 2d 1209, 1256 (D.N.M. 2010) ("to bring a claim under the New Mexico UPA, one must be a buyer of goods or services" and "a UPA claim may only be based on unfair practices in connection with the sale of goods or services"). Neither of these two requirements are met here. The current facts present an ownership dispute between business partners. Therefore, this disagreement does not pertain to the sale of goods, nor does it involve consumers in any way. Since Plaintiffs offer no evidence of statements made in connection with the sale of cordials, which is what the NMUPA requires, the Court will dismiss Count V—Breach of the New Mexico Unfair Practices Act. (Doc. 62 ¶¶ 38–40.)

### f) Count VI – Breach of Fiduciary Duty

Plaintiffs assert that Defendants, in accepting Plaintiffs' investment in the company, undertook a fiduciary duty, which they breached by using Plaintiffs' money for their own benefit. (Doc. 62 at 12–13.) "A fiduciary duty exists 'in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence.'" *Sambhi v. Singh*, No. 09-CV-1053 MCA/RLP, 2010 WL 11440939, at *3 (D.N.M. Aug. 31, 2010), at *3 (quoting *Branch v. Chamisa Dev. Corp. Ltd.*, 223 P.3d 942, 951 (N.M. Ct. App. 2009)). "Whether such a duty exists 'turns on whether the relationship between the parties is one of trust and confidence.'" *Id.* (*quoting Branch*, 223 P.3d at 951). "The elements to be proven include (1) the existence of a fiduciary relationship between the plaintiff and the defendant, (2) breach of that fiduciary relationship by the defendant, and (3) the breach of fiduciary relationship as the proximate cause of loss to the plaintiff." *Richter v. Van Amberg*, 97 F. Supp. 2d 1255, 1261 (D.N.M. 2000) (citations omitted). Defendants concede that there is a question of fact regarding the first and second elements; thus, only the third element is at issue. (Doc. 146 at 19.)

Defendants contend that "even if the duty was breached, the breach was not the proximate cause of the Plaintiffs' damages, as the law requires." (*Id.*) The Court agrees with Defendants. There is evidence that in 2018, Mr. Rusch invested $25,000 of his own money to create a separate alcoholic beverage business. (Doc. 138-1.) Plaintiffs assert that in doing so, Mr. Rusch breached a fiduciary duty to them. Yet Plaintiffs have proffered no evidence to show that Mr. Rusch's investment caused them to suffer a loss. Similarly, Plaintiffs state that Mr. Rusch sought further investments "as recently as November 2019 for the long-dissolved UNC-FL . . . ." (Doc. 138 at 19.) But again, Plaintiffs allege no damages caused by this attempt. Because

Plaintiffs have offered no evidence to show that they were damaged by any breach of fiduciary duty, they cannot defeat Defendants' motion for summary judgment. Therefore, the Court will dismiss Count VI – Breach of Fiduciary Duty. (Doc. 62 ¶¶ 41–43.)

### g) Count VII – Conversion

Plaintiffs "concede that they cannot presently offer evidence to support a claim for conversion of money from their investment . . . ." (Doc. 138 at 19.) Therefore, the Court will grant Defendant's motion as it pertains to Plaintiffs' claim for conversion. Count VII is dismissed. (Doc. 62 ¶¶ 44–46.)

### h) Count VIII – Prima Facie Tort

Plaintiffs state that they "have offered evidence supporting each element of a claim for prima facie tort." (Doc. 138 at 20.) A prima facie tort claim "provides a remedy for acts committed with an intent to injure the plaintiff and without justification." *Lexington Ins. Co. v. Rummel*, 945 P.2d 992, 995 (N.M. 1997) (citing *Schmitz v. Smentowski*, 785 P.2d 726, 735 (N.M. 1990)). "To bring a successful prima facie tort claim a plaintiff must show '(1) an intentional and lawful act; (2) an intent to injure the plaintiff; (3) injury to the plaintiff as a result of the intentional act; (4) and the absence of sufficient justification for the injurious act.'" *Beaudry v. Farmers Ins. Exch.*, 412 P.3d 1100, 1104 (N.M. 2018) (citing *Lexington*, 945 P.2d at 995). "Therefore, balancing the malicious intent of the defendant against both the justifications for the injurious act offered by the defendant and the severity of the injury is a necessary step in assessing whether a prima facie tort has been committed." *Lexington*, 945 P.2d at 995 (citation omitted). "Where there is no evidence of intent to injure, there is no need to proceed with the balancing test." *Id.*

Plaintiffs contend that "Dr. Rusch, directed by her husband, has willfully misrepresented Mr. Strobel's action in connection with the fulfillment of Defendants'

obligation to assign The Trademark . . . ." (Doc. 138 at 20.) Additionally, Plaintiffs argue that Defendants "intended to injure Plaintiffs, by depriving the entity in which Plaintiffs had invested from having ownership of the Trademark . . . ." (*Id.*) Lastly, Plaintiffs believe they have shown injury "by the loss of their investment . . . [and] by the loss of value to the cordials business entities . . . ." (*Id.*) Plaintiffs have not, however, offered any evidence to show that Defendants intended to injure anyone. Without such evidence, the Court finds Plaintiffs' bare allegations to be insufficient to withstand Defendants' summary judgment motion. Therefore, the Court will grant the motion on this issue and dismiss Count VIII. (Doc. 62 ¶¶ 47–49.)

## IV.   The Court grants in part Plaintiffs' Motion for Summary Judgment

In turn, Defendants bring eight counterclaims against Plaintiffs. They include: Trademark Infringement, Copyright Infringement, Removal of Copyright Management Information, False Advertising Under the NMUPA, Breach of Contract, Breach of Fiduciary Duty, Unjust Enrichment, and Conversion.[5] Defendants also make a request for Declaratory Judgment/Injunctive Relief. Plaintiffs move for summary judgment on all of these counterclaims. The Court finds that summary judgment is appropriate on all claims but one—Breach of Fiduciary Duty by Mr. Strobel. The Court will explain its reasoning as to all claims below.

### a)   Counterclaim II - Trademark Infringement

Defendants have asserted a counterclaim against Plaintiffs for infringement of their trademark, pursuant to Section 32 of the Lanham Act, 15 U.S.C. § 1114. (Doc. 145 ¶¶ 128–45.)

---

[5] Defendants listed four additional counterclaims in their complaint— Counterclaim I – False Designation of Origin & False Advertising; Counterclaim III – Trademark Infringement; Counterclaim VIII: Anticipatory Breach; Counterclaim IX: Indemnification. These claims were subsequently dismissed in the Court's Memorandum Opinion and Order on June 1, 2020. (*See* Doc. 103.)

Trademark infringement forbids any person from the "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). In order to prevail on a trademark infringement claim, an individual must prove: "(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used 'an identical or similar mark' in commerce, . . . ; and (3) that the defendant's use is likely to confuse consumers." *1-800 Contacts, Inc.*, 722 F.3d at 1238 (citations omitted). Plaintiffs admit that "registration may be available . . . to one who owns a trademark," and the mark is "registered in Dr. Rusch's name." (Doc. 138 at 2, 12.) "[T]he registration of a mark serves as prima facie evidence of both the mark's validity and the registrant's exclusive right to use it in commerce," *1-800 Contacts, Inc.*, 722 F.3d at 1238. Therefore, because Dr. Rusch has shown that she owns the trademark, the Court may conclude that Defendants have shown they have a protectable interest in the mark.

The next issue relates to whether Mr. Strobel used an "identical or similar mark" in commerce. The Rusches present only two allegations of Mr. Strobel's alleged use, both in the form of deposition testimony. Mr. Rusch, in his deposition testimony, stated that Mr. Strobel wrote an email to "Baur and the Canadian Bottling Company" in negotiations "about bottling the cordials products and commercializing the cordials product . . . ." (Doc. 114-3 at 13.) Next, the Rusches quote statements from Mr. Strobel's first deposition testimony. (Doc. 140-1 at 3.) There, Mr. Strobel was asked if the bottle labels said "that the IP is owned by UNC, Holding LLC . . . ." (*Id.*) Mr. Strobel responded in the affirmative, and then he was asked if the labels were sold with the UNC labeling. (*Id.* at 4.) He again responded in the affirmative but noted that "[t]hese labels were

designed by Uwe Rusch, and he was responsible for the entire print – to contact the printer, take the delivery, check whether they are printed right. I had nothing to do with it." (*Id*.)

Element two requires an "infringer [to] use[] an identical or similar mark in commerce . . . ." *1-800 Contacts Inc.*, 722 F.3d at 1238. The deposition testimony the Rusches cite in support of this claim is insufficient to meet element two. Mr. Rusches' deposition testimony, in and of itself, does not show that Mr. Strobel actually used the trademark in commerce. His testimony says nothing about Mr. Strobel using the trademark; it just shows that Mr. Strobel might have written an email to potential buyers. The Court does not know the contents of this alleged email, nor is it aware of interactions Mr. Strobel may or may not have had with "Baur and the Canadian Bottling Company." Further, Mr. Strobel never stated that he personally sent the labels out into commerce, but that Mr. Rusch was responsible for their design and printing. Therefore, Mr. and Dr. Rusch have not proffered enough evidence to create an issue of fact on this counterclaim. For this reason alone, summary judgment is granted.

Even if Mr. and Dr. Rusch could show Mr. Strobel used the trademark, they have not indicated that they were injured in any way by the use. Mr. Strobel asserts that "Mr. Rusch cannot identify any improper use of the Trademark or any damages he or his wife have suffered by any . . . improper use of the Trademark." (Doc. 114 at 19.) Essentially, Mr. Strobel argues that the Rusches cannot allege any injury suffered from the use of the trademark. In response, Mr. and Dr. Rusch cite no evidence to contradict Mr. Strobel's argument that they did not suffer redressable injury. Indeed, Mr. and Dr. Rusch fail to point to any evidence in the record that Mr. Rusches' "position in the marketplace has been damaged." Without an injury to their commercial interest, Mr. and Dr. Rusch do not have a claim under 15 U.S.C. § 1114. *See Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 131–32 (2014) (in analyzing a near identical claim under

§ 1125(a)(1)(A), the court stated "that to come within the zone of interests . . . a plaintiff must allege an injury to a commercial interest in reputation or sales"); *see also TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826–27 (9th Cir. 2011) (stating that a presumption of commercial injury takes place "when defendant and plaintiff are direct competitors" who "vie for the same dollars from the same consumer group") (quotation omitted); *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 346–50 (S.D.N.Y. 2019) (stating, in the absence of direct competition, plaintiff must have evidence of "actual injury"). Because Mr. and Dr. Rusch have failed to establish a triable issue regarding whether they suffered injury to any commercial interest in sales or business reputation, and because they have not shown that Mr. Strobel used an identical or similar mark in commerce, their claim fails. As a result, the Court will dismiss Counterclaim II – Trademark Infringement. (Doc. 145 ¶¶ 128–45.)

### b) Counterclaim IV – Copyright Infringement

Defendants contend that their claim for Copyright Infringement should stand because "there was use of the Royal Logo during the pendency of the business . . . ." (Doc. 140 at16.) The Copyright Act, 17 U.S.C. §§ 101–805 (the Act), provides that the owner of a copyright has sole authorization to do any of the following: "(1) to reproduce the copyrighted work in copies . . . ; (2) to prepare derivative works based upon the copyrighted work; [and] (3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . ." 17 U.S.C. § 106. The Act requires "*conduct* by a person who causes in some meaningful way an infringement." *CoStar Group, Inc., v. Loopnet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004). "An infringer engages in such conduct by 'trespass[ing] into [the copyright holder's] exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute.'" *Wood v. Houghton Mifflin Harcourt Pub. Co.*, 589 F. Supp. 2d 1230,

1243 (D. Colo. 2008) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984)).

Copyright infringement involves more than just copying, though. To sue for statutory copyright infringement, a plaintiff must first register its copyright. 17 U.S.C. § 411(a); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Plaintiffs argue that the claim should fail because Mr. Rusch has "not registered the copyright . . . , which was a necessary precondition set forth in 17 U.S.C. § 411[(a)] . . . ." (Doc. 114 at 20.) When Defendants first filed their Answer and Counterclaims on February 15, 2019, Mr. Rusch had not yet registered the copyright with the United States Copyright Office. Plaintiffs contend that Defendants' late registration on March 1, 2019, and subsequent filing of an Amended Answer and Counterclaims on April 4, 2019, did not cure the deficiency. (Doc. 41 at 14–15.) But the Supreme Court recently held that upon registration of a copyright, the copyright owner can recover for infringement that occurred both before and after registration. *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 886 (2019). Because Mr. and Dr. Rusch registered the copyright in March of 2019, they can recover.

After establishing that the copyright is registered, plaintiffs must establish two elements: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co. Inc.*, 499 U.S. 340, 361 (1991) (citation omitted). Because the copyright's registration record reflects ownership by Mr. Rusch, element one is met.[6] (Doc. 40-1 at 28.) Element two relates to whether Plaintiffs copied Defendants' work and relies on its own sub-elements: (a) whether the defendant factually copied the plaintiff's work; and (b) whether the elements that the defendant copied are protected by copyright. *Paycom*

---

[6] The Court completed its own search at the official United States Patent and Trademark Office website, https://www.uspto.gov/trademark, on November 18, 2020. Judicial notice of this record is proper, because the record "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

*Payroll, LLC v. Richison*, 758 F.3d 1198, 1204 (10th Cir. 2014); *see also Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996).

Even though Mr. and Dr. Rusch can show ownership of the copyright, they have not brought forward evidence to create a disputable fact as to whether Plaintiffs copied the copyright. Plaintiffs state, "there is no evidence supporting a contention that any of the [Plaintiffs] infringed the copyright . . . ." (Doc. 114 at 20.) Defendants do not offer evidence to refute this claim because they allege no facts to show that Plaintiffs copied their work. The Rusches cite the same two deposition testimony excerpts that they did to support their claim for copyright infringement. (*See* Docs. 114-3 at 13, 15; 140 at 3–4.) Neither of those excerpts demonstrate a viable copyright infringement claim because the testimony does not show that Mr. Strobel used or copied the copyright. At best, Mr. Rusch's testimony shows that Mr. Strobel may have written an email to potential buyers. (Doc. 114-3 at 13.) But again, the Court has no access to the contents of this alleged email, nor is it aware of interactions Mr. Strobel may or may not have had with "Baur and the Canadian Bottling Company." Also, Mr. Strobel's deposition testimony does not show that he personally sent the labels out into commerce, only that he saw them printed with the UNC labeling. (Doc. 140-1 at 3.) Nothing in the record shows that Plaintiffs copied Defendants' designs or logos. For these reasons, the Court grants Plaintiffs motion as to Counterclaim IV – Copyright Infringement. (Doc. 145 ¶¶ 167–74.)

### c)   Counterclaim V – Removal of Copyright Management Information

Section 1202 of the Copyright Act, 17 U.S.C. § 1202, prohibits individuals from "intentionally remov[ing]or alter[ing] any copyright management information . . . ."17 U.S.C.A. § 1202. Plaintiffs assert that Defendants "can offer no evidence of any act by [Plaintiffs] constituting a violation of [§ 1202]." (Doc. 114 at 21.) The Court agrees. There are two issues with

the "evidence" presented by Defendants in defense of their counterclaim. First, Defendants refer

to and rely on their pleadings. As stated above, rule 56(c) provides that "[a] party asserting that a

fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The respondent may

not simply "rest on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 259. Nor

can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported

by specific facts, or speculation." *Colony Nat'l Ins. Co.*, 2008 WL 2309005, at \*1 (citing Fed. R.

Civ. P. 56(e); *Argo*, 452 F.3d at 1199)). Therefore, reference to the pleadings is of no use. Second,

in the last line of their argument, Defendants reference one general citation to Exhibit A to support

their counterclaim. The Court is not inclined to search the bounds of the exhibit to find the nugget

Defendants are referencing, especially when the exhibit presents a great deal of information.[7]

"Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d

955, 956 (7th Cir. 1991). Accordingly, Defendants' Counterclaim V—Removal of Copyright

Management Information— is dismissed. (Doc. 145 ¶¶ 175–78.)

### d) Counterclaim VI – False Advertising Under the NMUPA

Once more, Plaintiffs assert that Defendants "have offered no admissible evidence . . . that

any of the [Plaintiffs] have done anything that constitutes false advertising under the UPA." (Doc.

114 at 22.) Again, the Court agrees because Defendants rely on the same two instances to defend

---

[7] If Defendants are referencing the excerpts mentioned above (Docs. 114-3 at 13, 15; 140 at 3–4), neither of those excerpts demonstrate a viable claim because the testimony does not show that Mr. Strobel removed, altered, or even used the copyright. At best, Mr. Rusch's testimony shows that Mr. Strobel may have written an email to potential buyers. (Doc. 114-3 at 13.) Also, Mr. Strobel's deposition testimony does not show that he personally sent the labels out into commerce, only that he saw them printed with the UNC labeling. (Doc. 140-1 at 3.)

their counterclaim—Mr. Strobel's alleged email (Doc. 114-3 at 13), and Mr. Strobel's viewing of labels with the UNC markings. (Doc. 140-1 at 3). As found multiple times above, these references do not show that Mr. Strobel "put products in the marketplace" or that he "advertised the product." (Doc. 140 at 19.) All these instances show, at best, is that Mr. Strobel may have written an email to potential buyers (Doc. 114-3 at 13), and that Mr. Strobel saw labels printed with the UNC markings. (Doc. 140-1 at 3). Without more evidence, no reasonable jury could find that Plaintiffs violated the NMUPA. Consequently, Defendants' Counterclaim VI— False Advertising Under New Mexico Unfair Practices— is dismissed. (Doc. 145 ¶¶ 179–83.)

### e) Counterclaim VII – Breach of Contract

Plaintiffs contend that "Mr. Rusch is unable to offer admissible evidence as to what the [Plaintiffs] have done to breach [the] agreement, or how he has been injured by their actions." (Doc. 114 at 22.) "Under New Mexico law, "'[t]he elements of a breach-of-contract action are the existence of the contract, breach of the contract, causation, and damages.'" *Anderson Living Tr.*, 952 F. Supp. at 1030 (quoting *Abreu*, 797 F. Supp. 2d at 1247). Defendants raise two theories of liability for this cause of action.

First, they contend that Mr. Strobel failed to complete the measures necessary to transfer the trademark. The Court finds no evidence to demonstrate that Plaintiffs breached the contract in this regard. The contract states, "Mr. Uwe Rusch and Mr. Volker E. Strobel will manage [UNC, Holding LLC's] business affairs as equal managing members." (Doc. 41-1 at 2.) The contract further declares, "[t]he costs of this transfer will be borne by [UNC, Holding LLC]." (*Id.*) Therefore, looking just at this contract language, one can deduce that Mr. Rusch and Mr. Strobel both bore the responsibilities of managing "business affairs," which one would assume entails dealing with the transfer cost at issue. More specifically, the contract stipulates that it is the

*company's* responsibility to pay for the transfer, not just one specific individual. Defendants acknowledge that "UNC-FL was responsible to pay for the transfer of the trademark . . . ." (Doc. 140 at 19.) Mr. Rusch, Ms. Strobel, Mr. Fischer, Mr. Baur, and Mr. Strobel were all members of UNC-FL. (Doc. 41-1 at 1.) Therefore, it is unavailing to assert a breach of contract action against Mr. Strobel for not paying for the transfer, when no contract language put this responsibility on any one member.

Next, Defendants assert that Mr. Strobel "breached his duty as manager of UNC-FL in distributing the funds from the companies' bank accounts in April of 2018." (Doc. 140 at 20.) The Court finds this claim unpersuasive because Defendants do not show that Mr. Strobel breached any contractual obligation. *See Salazar v. City of Albuquerque*, No. CIV 10-0645 JB/ACT, 2013 WL 5554185, at *25 (D.N.M. Aug. 20, 2013) (stating that "[a] person may breach a contract by failing to perform a contractual obligation when the performance is required . . .") (citing UJI 13-822 NMRA). The only evidence Defendants offer is Mr. Strobel's admission to transferring funds to "the members who had made cash capital contributions . . . ." (Doc. 115-2 at 4.) But nowhere do Defendants offer evidence to indicate what contractual provisions Mr. Strobel breached. Therefore, the Court finds that this bare allegation is not enough to create a factual dispute as to whether Mr. Strobel breached his contractual duties. The Court finds summary judgment appropriate for Counterclaim VII – Breach of Contract. (Doc. 145 ¶¶ 184–209.)

### a. Counterclaim X – Breach of Fiduciary Duty

Defendants argue that Mr. Strobel breached his fiduciary duties to them by: 1) failing to ensure the transfer of the trademark was paid for; 2) making unauthorized payments for office space; 3) failing to take steps to record the trademark transfer or prevent misrepresentations of the trademarks ownership; and 4) improperly distributing funds from the cordials business to other

investors. (Doc. 140 at 21–22.) "The elements to be proven include (1) the existence of a fiduciary relationship between the plaintiff and the defendant, (2) breach of that fiduciary relationship by the defendant, and (3) the breach of fiduciary relationship as the proximate cause of loss to the plaintiff." *Richter*, 97 F. Supp. 2d at 1261. "[A] fiduciary relationship imposes a duty on the fiduciary that is greater than the duty of good faith and fair dealing implied in all contractual relationships." *Mayeux v. Winder*, 131 P.3d 85, 93–94 (N.M. Ct. App. 2006) (citation omitted). New Mexico "[c]ourts recognize that a fiduciary duty or confidential relationship can exist in a variety of contexts depending upon whether the relationship between the parties is one of trust and confidence." *Moody v. Stribling*, 985 P.2d 1210, 1216 (N.M. Ct. App. 1999) (gathering cases). Plaintiffs concede that there is a question of fact as to the existence of a fiduciary relationship between Mr. Strobel and Mr. Rusch. (Doc. 114 at 23.) Even if Plaintiffs had not conceded this element, though, the fact that Mr. Strobel and Mr. Rusch contracted to "manage [UNC, Holding LLC's] business affairs as equal managing members" (Doc. 41-1 at 2), creates at least a plausible inference that the parties had a fiduciary relationship. *See Moody*, 985 P.2d at 1216 ("[A] fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence.") (quoting *Allsup's Convenience Stores, Inc. v. N. River Ins, Co.*, 976 P.2d 1, 15 (N.M. 1999)) (subsequent citation omitted). Therefore, the Court finds that element one is met with respect to Mr. Strobel.

As to element two, which requires proof of breach, the Court finds that claims one (failure to pay for the transfer of the trademark) and three (failure to record the trademark transfer or prevent misrepresentations) do not involve a genuine dispute of fact. As stated above in the breach of contract section, Mr. Rusch and Mr. Strobel both bore the responsibilities of managing "business

affairs," and Defendants offer no evidence to indicate that it was solely Mr. Strobel's job to deal with transfer of the trademark. Not only this, but the contract also stipulates that it is the company's responsibility to pay for the transfer, not just one specific individual. Therefore, Defendants cannot show that Mr. Strobel had any more of a duty to perform these tasks than another member. Plaintiffs' motion is granted as to claims one and three.

Regarding claim two (Mr. Strobel's unauthorized payments for office space), the Court also finds that there is no genuine factual dispute as to whether Mr. Strobel breached his fiduciary duty. Defendants aver that Mr. Strobel "made payments for office space that [were] not authorized by other members." (Doc. 140 at 21.) Plaintiffs argue in reply that "no authorization was required" to make such payments (Doc. 143 at 12), but the contract clearly states that "[r]ental of facilities for business operations' requires "at least 75 percent of all votes" by members (Doc. 41-1 at 4.) There are two basic categories of duties in a fiduciary relationship: the duty of care and the duty of loyalty. CARTER G. BISHOP, LIMITED LIABILITY COMPANIES: TAX AND BUSINESS LAW (2020). "The duty of care is not a duty of perfection. Rather it is a duty to attend to the business, to avoid neglect, and to exercise judgment." *Id.* "Analysis of the duty of care resembles the analysis of tort law negligence and has two components: a standard of care (typically either ordinary negligence or gross negligence) and a context for determining the meaning of that standard . . . ." *Id.* Here, Defendants offer no evidence to show that Mr. Strobel acted negligently in making this unauthorized payment. Therefore, the duty of care is not an issue. Regarding the duty of loyalty, "[a] fiduciary is obliged 'to act primarily for another's benefit in matters connected with such undertaking' . . . [and] breaches this duty by placing his interests above those of the beneficiary." *Kueffer v. Kueffer*, 791 P.2d 461, 464 (N. M 1990) (citing Black's Law Dictionary 563 (5th ed. 1979)). Defendants offer no factual evidence to support the inference that Mr. Strobel breached

his duty of loyalty. In fact, Defendants assert that Mr. Strobel made unauthorized payments "for office space." (Doc. 140 at 21.) As the unauthorized payment is for "office space," the Court contends that the direct beneficiary of the purchase was the company, not Mr. Strobel. Therefore, the duty of loyalty was not breached either. Ultimately, the Court finds that this claim might have found more fertile ground under a breach of contract theory. The contract clearly states that "[r]ental of facilities for business operations" requires "at least 75 percent of all votes" by members (Doc. 41-1 at 4), and Defendants allege that Mr. Strobel did not get the required number of votes. As this theory was not presented to the Court, the Court cannot find a breach of the contract on this basis. Ultimately, Plaintiffs' motion is granted as to the second theory.

As to claim four (improper distributions of funds to other investors), the Court finds that there is a genuine issue of fact as to whether Mr. Strobel breached his fiduciary duty to Mr. Rusch. Mr. Strobel admits that he "transferred the balance remaining to his *own* account for the benefit of *himself, his wife, and his lifetime friend* Hans Baur . . . ." (Doc. 115-2 at 4) (emphasis added). The New Mexico Limited Liability Company Act details how distributions are to take place at the winding down of a business. After moneys are distributed to creditors and members owed obligations, the company is to distribute the remaining funds to "members at the date of dissolution in . . . proportion[] . . . [to] the values of their contributions to the capital of the limited liability company adjusted for withdrawals . . . ." N.M. Stat. Ann. § 53-19-44 (West 2020). Plaintiffs offer no evidence showing that Mr. Rusch was not entitled to a share of the distribution in proportion to his contribution. Nor do they offer any evidence to show that Mr. Rusch was even aware these distributions were taking place. The parties agree that the Plaintiffs and Mr. Fischer invested $450,000 into UNC-FL. (Doc. 140 at 5.) The contract also states that Mr. Rusch had a 46% stake in the company. Though there is no documentary evidence as to what contributions Mr. Rusch

made to the company, he set up the company in 2012 and acted as the chief decision maker by having a majority stake in the company. Therefore, the Court deduces that Mr. Rusch had to have added at least some value to the company by way of expertise or knowledge and may have been entitled to a part of the distributions. As a fiduciary, Mr. Strobel was obliged to act primarily for the benefit of all members, but Mr. Rusch did not gain any benefit from this distribution. Mr. Strobel, his wife, and a "lifetime friend" benefited. These issues raise the question of whether Mr. Strobel breached his duty by placing his interests above those of other members. Plaintiffs try to circumvent the issue by essentially arguing that the amount of money distributed was small and Mr. Rusch did not deserve it because he and his wife refused to transfer the marks. (Doc. 143 at 12.) Fortunately, the law's aim is not to protect those who may deserve it most, but instead to uphold justice. Regardless of the alleged wrong done by Mr. Rusch, if he was owed a share of the distribution, then he should have received it. Therefore, the Court holds that there is a genuine issue of fact as to whether Mr. Strobel breached his fiduciary duty regarding the distribution of funds.

Lastly, the Court examines element three— the breach of fiduciary relationship as the proximate cause of loss to the plaintiff. *See Turpin v. Smedinghoff*, 874 P.2d 1262, 1265 (N.M. 1994) (stating that plaintiffs must show that they suffered harm from the breach). Plaintiffs argue that "Mr. Rusch has offered no admissible evidence to support a claim that he was injured by a breach of duty owed to him by Mr. Strobel." (Doc. 143 at 12.) The Court notes that Mr. Rusch does not explicitly state damages under the counterclaim for breach of fiduciary duty. But Rusch made an identical claim under his Breach of Contract Counterclaim—that Mr. Strobel distributed funds to everyone but him. In that argument, Mr. Rusch stated that Mr. Strobel's actions "resulted in measurable damages to [him], namely, his 46% of the assets of the company." (Doc. 140 at 20.)

The Court holds this to be adequate proof of damages. Therefore, the Court will deny Plaintiffs' motion as to Defendants' contention that Mr. Strobel breached his fiduciary duty by distributing funds to all members but Mr. Rusch.  (Doc. 145 ¶¶ 222–34.)

### b. Counterclaim XI – Unjust Enrichment

Defendants base their Unjust Enrichment claim on Mr. Strobel's "removal of company funds from the bank account for the companies, and the other Plaintiffs' acceptance of those claims." (Doc. 140 at 22.) "[U]njust enrichment is widely accepted as an alternative theory of recovery, should the factfinder determine that no contract between the parties exists." *Qwest Corp. v. City of Santa Fe*, No. 10-CV-0617 RB/KBM, 2013 WL 12241274, at *12 (D.N.M. Feb. 8, 2013), *order clarified*, 2013 WL 12241269 (Apr. 5, 2013) (citation omitted); *see also* 26 RICHARD A. LORD, *WILLISTON ON CONTRACTS* § 68:5 (4th ed. 2004) ("Where the plaintiff has no alternative right on an enforceable contract, the basis of the plaintiff's recovery is the unjust enrichment of the defendant."). But "[c]ourts interpreting New Mexico law have cautioned that courts should not 'resort to the doctrine of unjust enrichment to override a contractual provision.'" *Qwest Corp.*, 2013 WL 12241274, at *12 (quoting *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005)). "[E]quity does not take the place of remedies at law, it augments them; in this regard, an action in contract would be preferred to one in quasi-contract." *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 699 (N.M. Ct .App. 2000) (citation omitted). Defendants' unjust enrichment claim fails because the claim for underpayment of assets at distribution is grounded in the parties' contractual relationship. The contract may not delineate any specific distributions, yet it controls how distributions of profits are to be paid and how dissolution is to proceed. (Doc. 41-1 at 4.) Therefore, Counterclaim XI is dismissed. (Doc. 145 ¶¶ 235–41.)

### c. Counterclaim XII– Conversion

Defendants bring a Counterclaim under the theory of conversion. "Conversion is the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *President & Fellows of Harvard Coll. v. Elmore*, 222 F. Supp. 3d 1050, 1063–64 (D.N.M. 2016) (quoting *Muncey v. Eyeglass World, LLC*, 289 P.3d 1255, 1262 (N.M. 2012)) (quotation marks omitted). "Generally speaking, conversion applies to chattel; however, money can be the subject of a conversion claim if the plaintiff has the right to a specific identifiable fund of money." *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 130 F. Supp. 3d 236, 258 (D.D.C. 2015) (quoting *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013)) (subsequent citation omitted).

Defendants contend that "Mr. Strobel improperly and without  authorization removed funds from the company bank account and distributed it to the members who originally contributed cash to the relevant companies." (Doc. 140 at 23.) But Defendants cite no evidence to indicate how much money Mr. Rusch was owed from the distributions. Because Defendants claim to be owed an unspecified, unidentified portion of a larger pool of funds, a claim for conversion cannot be maintained. *See Flores v. Bank of Am., N.A.*, No. 18-CV-2527-WJM-KLM, 2019 WL 2470923, at *15 (D. Colo. June 13, 2019) (stating that "money is not the subject of a conversion claim unless it is a discrete sum, segregated from undifferentiated funds"); *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 833 n.3 (Md. Ct. App. 2004) ("As a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds.") (citations omitted); *Tomlinson v. Burkett*, No.

A-1-CA-35610, 2018 WL 3868704, at *5 (N.M. Ct. App. July 18, 2018) (stating "the common-law rule that 'the action for conversion would lie only for interference with rights in tangible personal property[,]'" but that New Mexico cases have allowed judgments for conversion when there is a specifically-identifiable amount of money) (quoting DAN B. DOBBS ET. AL., DOBBS' LAW OF TORTS § 709 (2d ed. 2018)). Because Defendants have not provided evidence to support this claim, the Court grants the motion on this issue and counterclaim XI is dismissed. (Doc. 145 ¶ 242–245.)

### d.   Counterclaim XIII – Declaratory Judgment/Injunctive Relief

Lastly, Defendants seek a declaratory judgment that "UNC-NM is separate from UNC-FL and has no rights in this matter and that any business relationships agreed upon by the parties . . . related exclusively to UNC-FL." (Doc. 114 at 24) (internal quotations omitted). Defendants also seek a declaration that "no Plaintiff has any personal rights to any property of UNC-FL, other than the possible interests each party holds in their respective shares of the legal entity." (*Id*) (internal quotations omitted). Defendants conclude that "[t]he crux of the issue in this case is whether UNC-NM has any right to the trademark and copyright for VIP Cordials." (Doc. 140 at 24.)

Mr. Rusch contends that he did not know he was a member of UNC-NM until he received notice during his deposition (Doc. 114-3 at 22), but the evidence does not support that contention. Mr. Rusch states that he saw the Articles of Organization for UNC-NM sometime in 2018 (Doc. 114-3 at 22), and he even said that he "agreed generally to move . . . UNC-Florida to New Mexico." (*Id*. at 21.) Mr. Rusch also admitted that if "[Mr. Strobel] proves that I am a shareholder of the company and that I am an officer of this company, I have no problem with transferring to [UNC-NM]." (*Id*. at 21). Mr. Strobel specified that to the best of his knowledge "[t]he members' respective interests in . . . UNC-NM . . . has not changed . . . [and] Mr. Rusch continues to own 46

percent of the two currently-extant companies, UNC-NM and V.I.P. Bottling." (Doc. 114-5 at 3.)

In conclusion, Plaintiffs counter by stating:

> It is undisputed . . . that UNC-FL was dissolved effective April 18, 2014 by Articles signed and submitted by Mr. Rusch . . . ; that on the same date UNC-NM was officially formed in New Mexico by Articles signed and submitted by Mr. Strobel . . . ; that Mr. Rusch, CEO of all these companies, was aware of all of this; that tax returns were filed for UNC-NM for the years 2014 through 2018, and K-1s issued to the members of that company . . . ; that Mr. Rusch filed his K-1s with his personal tax returns for those years . . . ; and that Mr. Rusch never complained about UNC-NM having succeeded to the business begun by UNC-FL, until 2018.

(Doc. 114 at 24.) The Court finds the parties statements to be telling, but neither party presented the Court with documentary evidence to show that UNC-NM is a valid limited liability company. Consequently, the Court completed its own search at the official New Mexico Secretary of State website. It found that UNC-NM is in fact a legitimate limited liability company held in "good standing" with the state of New Mexico.[8] Not only this, but Mr. Rusch also filled out his K-1 form, which is an Internal Revenue Service tax form for an investment in a partnership, for UNC-NM in 2014. (Doc. 100-2 at 9.) Because of these admissions, assertions, and proofs, the Court finds there to be enough evidence to conclude that UNC-NM succeeded UNC-FL and has right to the trademark and copyright. (Doc. 145 ¶ 246–249.)

## V.   Conclusion

Overall, the Court found there to be a significant lack of evidence to support most claims and counterclaims brought by both Plaintiffs and Defendants. Because of these omissions, and the arguments outlined above, the Court denies both Plaintiffs' and Defendants' motions for summary

---

[8]   The Court completed its own search at the official New Mexico Secretary of State, https://portal.sos.state.nm.us/BFS/online/CorporationBusinessSearch/CorporationBusinessInformation, on November 18, 2020. The Court takes judicial notice of UNC-NMs validity and good standing with the New Mexico Secretary of State's office. Judicial notice of this record is proper, because the record "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

judgment in part. Consequently, both parties only have one remaining claim: Count III- Breach of Contract by Dr. Rusch and Counterclaim X- Breach of Fiduciary Duty by Mr. Strobel.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 114) is **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants' Cross-Motion for Summary Judgment on All Counts of the Complaint and Memorandum in Support (Doc. 115) is also **DENIED IN PART**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**